**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GEORGE WILLIAMS, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>MERCADIEN P.C., CPAS, and IRCO COMMUNITY FEDERAL CREDIT UNION,<br><br>Defendants. | Case No. ________<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff, George Williams ("Plaintiff"), brings this Class Action Complaint against Defendants Mercadien P.C., CPAS ("Mercadien") and IRCO Federal Credit Union ("IRCO") (collectively "Defendants") individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsel's investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is a class action arising out of the recent data breach ("Data Breach") involving Defendants that compromised Plaintiff's and Class Members' Personally Identifiable Information ("PII" or "Private Information").

2. Mercadien is an accounting firm that offers professional financial services to businesses and financial institutions ("Clients"). IRCO is a financial institution that provides personal banking, business banking, and similar financial services to customers. IRCO contracts with Mercadien for its services.

3. In their ordinary courses of business operations, each Defendant collects, stores, and maintains sensitive Private Information. Mercadien, as an accounting firm, was responsible

for implementing adequate security measures to safeguard the Private Information of its Clients' customers. Defendant IRCO, as a client of Defendant Mercadien, was responsible for conducting reasonable due diligence before selecting Defendant Mercadien as a vendor and for establishing appropriate oversight mechanisms to ensure Defendant Mercadien was properly safeguarding IRCO's customer data. Both Defendants have a respective resulting duty to securely maintain such information in confidence.

4. On or around November 7, 2025, Defendant Mercadien detected suspicious activity on its computer networks. Shortly thereafter, it was determined that Mercadien experienced a Data Breach in which an unauthorized third-party gained access to its computer network and accessed certain files within Mercadien's network which included Mercadien's Clients' customers, including Plaintiff and Class Members.[1]

5. Upon information and belief, Plaintiff's and Class Members' names, dates of birth, Social Security/ITIN numbers, financial/bank account numbers, and other sensitive information were compromised in the Data Breach.

6. Plaintiff was not notified about the breach until July 2, 2026, approximately nine months after his information was first accessed.[2]

7. Upon information and belief, customers are required to entrust Defendants, either directly or indirectly, with sensitive, non-public Private Information, without which Defendants could not perform their regular business activities. Defendants retain this information for at least many years and even after the customer relationships have ended.

---

[1] *See* Plaintiff's Notice Letter, attached as **Exhibit A**.
[2] *Id.*

8. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, each Defendants independently assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

9. Each Defendant independently failed to adequately protect Plaintiff's and Class Members' Private Information. This unencrypted, unredacted Private Information was compromised due to each Defendants' respective negligent and/or careless acts and omissions and their utter failure to protect Plaintiff's and Class Members' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

10. In breaching their respective duties to properly safeguard Plaintiff's and Class Members' Private Information and give them timely, adequate notice of the Data Breach's occurrence, each Defendants' conduct amounts to negligence and/or recklessness and violates federal and state statutes.

11. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of each Defendants' respective failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Each Defendants' respective conduct amounts at least to negligence and violates federal and state statutes.

12. Each Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable

measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use.

13. Defendant IRCO, as the entity who selected Mercadien and directed that sensitive customer data be provided to Mercadien, owed duties to properly vet, monitor, and supervise its third-party vendors. Defendant Mercadien as the firm entrusted with Private Information, owed duties under common law to implement and maintain adequate cybersecurity measures to safeguard such information. Each Defendant solicited, collected, used, and derived a benefit from the Private Information, yet each breached its respective duties by failing to implement or maintain adequate security practices.

14. As a result of Defendants' respective failures, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party, and subsequently made available on the Dark Web. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

15. Plaintiff and Class Members have suffered injury as a result of each Defendants' respective conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails and unauthorized access to his bank account; (viii) nominal damages; and (ix) the continued and

certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

16. Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

17. Plaintiff George Williams is a resident and citizen of Easton, Pennsylvania where he intends to remain.

18. Defendant Mercadien P.C., CPAs is a professional financial services corporation headquartered in Princeton, New Jersey. They offer a number of auditing, tax, and risk management services to businesses, non-profits, and individuals. Mercadien's corporate policies and practices, including those used for data privacy, are established in, and emanate from the state of New Jersey.

19. Defendant IRCO Community Federal Credit Union is a financial services company headquartered in Philipsburg, New Jersey.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Nationwide class, and at least one member of the Nationwide Class are citizens of a state different from Defendants, including Plaintiff.

21. This Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business in this District, and Defendants regularly conduct business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

22. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendants' principal place of business are in this District and because a substantial part of the events or omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

23. Defendant Mercadien is an accounting firm that offers professional financial services to its Clients who are businesses and financial institutions, including IRCO.

24. Defendant IRCO provides financial and banking services to thousands of clients throughout New Jersey and Pennsylvania.

25. In order to obtain services from IRCO, Plaintiff and Class Members were required to provide Defendants, either directly or indirectly, with their sensitive and confidential Private Information.

26. The information held by Defendants in their computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

27. Upon information and belief, Defendants made promises and representations to Plaintiff and Class Members, including through their privacy policies, that the Private Information collected from them would be kept safe, confidential, that the privacy of that information would

be maintained, and that Defendants would delete any sensitive information after they were no longer required to maintain it.[3]

28. Plaintiff and Class Members directly or indirectly provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

29. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

30. As a result of collecting and storing the Private Information of Plaintiff and Class Members for their own financial benefit, each Defendant had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to third parties. Defendant Mercadien had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant IRCO had a duty to conduct reasonable due diligence before selecting Defendant Mercadien as a vendor and to establish appropriate oversight mechanisms to ensure Defendant Mercadien was properly safeguarding Defendant IRCO's customer data.

---

[3] Privacy Policy available at https://www.ircocu.org/privacy-policy/ ("IRCO Community Federal Credit Union will protect the personal information of its members" and "The credit union will only partner with businesses that follow strict confidentiality and privacy requirements.") (last visited July 10, 2026).

31. Each Defendant had obligations created by the FTC Act, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

32. Each Defendant derived a substantial economic benefit from collecting and using Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendants could not provide their services to Plaintiff and Class Members.

33. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, each Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

34. Defendant IRCO had this duty as the primary custodian of Plaintiff's Private Information and the entity who selected the vendor Mercadien and directed its Plaintiff's and Class Members' Private Information be provided to Defendant Mercadien.

35. Defendant Mercadien had this duty as the entity entrusted with Plaintiff's and Class Members' Private Information, and the operator of the systems storing such information.

**B. The Data Breach**

36. On or around November 7, 2025, Defendant Mercadien detected suspicious activity on its computer networks. Shortly thereafter, its investigation revealed that Mercadien experienced a Data Breach in which an unauthorized third-party gained access to certain files within Mercadien's network containing sensitive data belonging to Defendant Mercadien's Clients' customers, including Plaintiff and Class Members.[4]

---

[4] Ex. A.

37. IRCO was informed of the Data Breach suffered by Mercadien and sent notice to impacted clients on or around July 2, 2026 ("Notice Letter").[5]

38. Upon information and belief, Plaintiff's and Class Members' names, dates of birth, Social Security/ITIN numbers, financial/bank account numbers, and other sensitive information were compromised in the Data Breach.[6]

39. Upon learning of the Data Breach, Mercadien investigated the breach. Although Mercadien has not provided an estimate of how many customers were affected by the Data Breach, the incident appears to have impacted clients of multiple financial institutions.

40. Defendants offered no explanation for the delay between the initial discovery of the Breach and the belated notification to affected customers, which resulted in Plaintiff and Class members suffering harm they otherwise could have avoided had a timely disclosure been made.

41. IRCO's notice of Data Breach was not just untimely but woefully deficient, failing to provide basic details, including but not limited to, how unauthorized parties accessed Mercadien's networks, whether the information was encrypted or otherwise protected, how it learned of the Data Breach, whether the breach occurred system-wide, whether servers storing information were accessed, and how many customers were affected by the Data Breach. Even worse, Defendants offered only one year of identity monitoring for Plaintiff and Class members, which required their disclosure of additional PII with which Defendants had just demonstrated they could not be trusted.

42. Each Defendant individually failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information.

---

[5] *Id.*
[6] *Id.*

43. Defendant IRCO failed to exercise care in selecting its vendors and failed to adequately audit and monitor the data security practices of Defendant Mercadien to whom they entrusted the care and safeguarding of Plaintiff's Private Information.

44. Defendant Mercadien could have prevented or mitigated the consequences of the Data Breach by implementing clearinghouse practices to delete or redact data that they were no longer required to maintain, encrypting data at rest or in transit, implementing multi-factor authentication, and monitoring their systems to detect unauthorized access or the transfer of large volumes of data to third party networks. These are all reasonable and expected industry standard data security practices.

45. Upon information and belief, the Private Information was not encrypted prior to the Data Breach.

46. Upon information and belief, the cyberattack was targeted at Defendants as companies that collect and maintain valuable personal data from many individuals, including Plaintiff and Class Members.

47. Upon information and belief, the cyberattack was expressly designed to gain access to private and confidential data, including (among other things) the Private Information of Plaintiff and Class Members.

48. Each Defendant had obligations to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

49. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

50. Upon information and belief, Defendants made promises to Plaintiff and Class members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

51. Plaintiff further believe that their Private Information and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**C. The Data Breach Was Foreseeable and the Defendants Were Aware of Its Risk**

52. It is well known that Private Information, including names and Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

53. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendants, preceding the date of the Data Breach.

54. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendants, preceding the date of the Data Breach.

55. In 2023, a record 3,205 data breaches occurred in the United States, resulting in about 349,221,481 sensitive records being exposed, a greater than 100% increase from 2019.[7] These statistics have held steady for 2024 – when 3,158 data compromises occurred. [8]

---

[7] ITRC (Identity Theft Resource Center), *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited July 10, 2026).
[8] ITRC (Identity Theft Resource Center), *2024 Data Breach Report* (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited July 10, 2026).

56. Individuals place a high value not only on their PII, but also on the privacy of that data. For the individual, identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

57. In light of recent high profile data breaches at other industry leading companies, including, LoanDepot (16.9 million affected, January 2024), Evolve Bank & Trust (7.6 million affected, May 2024), Financial Business and Consumer Solutions (4.2 million affected, February 2024), and Prudential Financial (2.5 million affected, February 2024) Defendants knew or should have known that their and their vendors' electronic records would be targeted by cybercriminals.

58. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

59. Defendant IRCO as a financial institution handling highly sensitive personal and financial information, was particularly aware of the value of such data to cybercriminals. Further, Defendant IRCO was aware of the risks inherent in entrusting sensitive customer data to third-party vendors.

60. Defendant Mercadien, as an accounting firm providing services to financial institutions, was aware of the prevalence of ransomware attacks targeting entities in possession of sensitive data.

61. Despite the prevalence of public announcements of data breach and data security compromises, their own acknowledgments of data security compromises, and their own acknowledgment of their duties to keep Private Information private and secure, each Defendant individually failed to take appropriate steps to protect the Private Information of Plaintiff and the proposed Class from being compromised.

**D. Defendants Could Have Prevented the Data Breach**

62. Data breaches are preventable.[9] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[10] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[11]

63. Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[12]

64. Here, many failures laid the groundwork for the Data Breach.

65. Specifically, Defendant IRCO failed to properly vet, monitor, and supervise Defendant Mercadien to ensure it implemented adequate security safeguards to protect the sensitive data entrusted to it.

66. Defendant Mercadien failed to implement adequate security safeguards sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

67. The FTC has published guidelines that establish reasonable data security practices for businesses.[13]

---

[9] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[10] *Id.* at 17.
[11] *Id.* at 28.
[12] *Id.*
[13] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

68. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[14]

69. The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[15]

70. The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[16]

71. According to information and belief, each Defendant independently failed to follow reasonable and necessary industry standards to prevent a data breach, including the FTC's guidelines.

72. Each Defendant was at all times fully aware of their obligation to protect the Private Information of consumers under the FTC Act, yet failed to comply with such obligations. Each Defendant was also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored, and the foreseeable consequences of the immense damages that would result to Plaintiff and the Classes.

[14] *Id.*
[15] *Id.*
[16] *Id.*

73. Based on allowing its security certificates to lapse and upon information and belief, Defendants also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

74. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[17]

75. To prevent and detect the attack here, Defendants could and should have taken, as recommended by the Federal Bureau of Investigation, the following measures:

- Implemented an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enabled strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scanned all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

[17] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Configured firewalls to block access to known malicious IP addresses.
- Patched operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Managed the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configured access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disabled macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implemented Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Considered disabling Remote Desktop protocol (RDP) if it is not being used.
- Used application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Executed operating system environments or specific programs in a virtualized environment.
- Categorized data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[18]

76. According to information and belief, each Defendant independently failed to do any of the above.

77. To prevent and detect cyberattacks, Defendants could and should have recommended their employees, as recommended by the United States Cybersecurity & Infrastructure Security Agency, take the following measures:

- **Updated and patched your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.
- **Used caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legit Mercadien sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

[18] *Id.* at 3–4.

- **Opened email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.
- **Kept your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.
- **Verified email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.
- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.
- **Used and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[19]

78. In addition, to prevent and detect the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

[19] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

- **Harden internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audits
- **Thoroughly investigate and remediate alerts.**
  - Prioritize and treat commodity malware infections as potential full compromise of the system
- **Include IT professionals in security discussions.**
  - Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely
- **Build and maintain credential hygiene**
  - Use multifactor authentication or network level authentication and enforce strong, randomized, just-in-time local administrator passwords
- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events
- **Harden infrastructure**
  - Utilize Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection

- Turn on attack surface reduction rules and AntMercadienlware Scan Interface for Office Visual Basic for Applications[20]

79. Specifically, among other failures, Defendants had far too much confidential unencrypted information held on their systems. Such Private Information should have been segregated into an encrypted system.[21]

80. Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[22]

81. The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[23] Rather than following this basic standard of care, each Defendant kept thousands of individuals' unencrypted Private Information on their inadequately secured systems indefinitely.

82. In sum, the Data Breach could have been easily prevented through standard practices like the use of industry standard network segmentation, redaction, and encryption of all Private Information—which each Defendant independently and negligently failed to do.

83. Further, the scope of the Data Breach could have been dramatically reduced had Defendants utilized proper record retention and destruction practices—but each Defendant independently and negligently did no such thing.

---

[20] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

[21] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.

[22] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[23] *Id.* at 6.

**E. Each Defendant Had An Independent Duty to Plaintiff and Class Members to Secure Private Information**

84. At all relevant times, each Defendant had an independent duty to Plaintiff and Class Members to properly secure their PII, encrypt and maintain such information using industry standard methods, train their employees, utilize available technology to defend their systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to *promptly* notify Plaintiff and Class Members when Defendants became aware that their PII may have been compromised.

85. Each Defendants' duty to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and the Class Members. The special relationship arose because Plaintiff and the Members of the Nationwide Class relied on Defendants to secure their PII when they entrusted Defendants with the information required in connection with the services Defendants provide.

86. Each Defendant independently had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite their independent obligations to protect such information. Accordingly, each Defendant breached its respective common law, statutory, and other duties owed to Plaintiff and Class Members.

87. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

a. Maintaining a secure firewall configuration;

b. Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c. Monitoring for suspicious or irregular traffic to servers;

d. Monitoring for suspicious credentials used to access servers;

e. Monitoring for suspicious or irregular activity by known users;

f. Monitoring for suspicious or unknown users;

g. Monitoring for suspicious or irregular server requests;

h. Monitoring for server requests for PII;

i. Monitoring for server requests from VPNs; and

j. Monitoring for server requests from Tor exit nodes.

88. The ramifications of each Defendants' respective failure to keep PII secure are long lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is likely to continue for years.

**F. The Value of Personally Identifiable Information**

89. The Private Information of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, [24] and bank details can have a price range of $30 to over $4,000.[25]

90. As a growing number of federal courts have begun to recognize the loss of value of Private Information as a viable damages theory, the sale of Private Information from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims – especially when it takes place on the dark web.

91. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[26] Criminals in particular favor the dark web as it offers a degree of

---

[24] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited July 10, 2026).

[25] https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 10, 2026).

[26] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 10, 2026).

anonymity to visitors and website publishers. Unlike the traditional or ‘surface’ web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA’s web address is cia.gov, but on the dark web the CIA’s web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[27] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

92. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the Private Information at issue here.[28] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth and other personal information.[29] As Microsoft warns “[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others.” [30]

93. Plaintiff’s and Class Members’ Private Information is a valuable commodity, a market exists for Plaintiff’s and Class Members’ Private Information (which is why the Data Breach was perpetrated in the first place), and Plaintiff’s and Class Members’ Private Information is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves) – as

---

[27] *Id*.

[28] [28] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited July 10, 2026).

[29] [29] *Id.*; *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 10, 2026).

[30] [30] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited July 10, 2026).

a result, Plaintiff and Class Members have lost the value of their Private Information, which is sufficient to plausibly allege injury arising from a data breach.

94. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[31] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[32] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[33]

95. The Private Information stolen in this specific Data Breach was particularly harmful.

96. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including: 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts," and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft; and 5) Utility Fraud.

97. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised in

---

[31] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited July 10, 2026).
[32] https://datacoup.com/ (last visited July 10, 2026).
[33] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited July 10, 2026).

the Data Breach, are among the worst kinds of private information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

98. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimate gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [34] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[35]

99. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[36]

100. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[37] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[38]

---

[34] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases. (last visited July 10, 2026)
[35] *Id.*
[36] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 10, 2026)
[37] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited July 10, 2026)
[38] *See* https://www.investopedia.com/terms/s/ssn.asp (last visited July 10, 2026)

101. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

102. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[39]

103. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number

[39] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 10, 2026)

derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

104. Private Information can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[40]

105. Given the nature of Defendants' Data Breach, as well as the complete failure to notify Class Members, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' PII can easily obtain Plaintiff's and Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

106. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' respective failures to implement or maintain adequate data security measures.

**G. The Harm Caused by the Data Breach Now and Going Forward**

107. Victims of data breaches are susceptible to becoming victims of identity theft for years to come. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9).

108. The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft and Plaintiff and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

---

[40] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.

109. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web, where malicious actors buy and sell that information for profit.[41]

110. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[42] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[43]

111. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes discussed below.

112. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

113. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social

[41] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited July 10, 2026).
[42] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018) https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited July 10, 2026).
[43] *Id.*

engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches can be the starting point for these additional targeted attacks on the victim.

114. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[44]

115. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

116. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information, such as emails, phone numbers, or credit card numbers, may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[44] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.(last visited July 10, 2026).

**H. Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

117. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[45] Defendants did not rapidly report to Plaintiff and Class Members that their Private Information had been stolen. In fact, to date, Defendants have not sent any notice of the Data Breach to affected individuals, depriving Plaintiff's and Class Members' of the earliest (and any) opportunity to mitigate their damages.

118. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

119. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to detect.

[45] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion (last visited July 10, 2026).

120. These efforts are consistent with the U.S. Government Accountability Office, which released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.[46]

121. These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[47]

**I. Diminution of Value of Private Information**

122. Private Information is a valuable property right.[48] The value is axiomatic, considering the value of Big Data in corporate America, and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond a doubt that Private Information has considerable market value.

123. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an

---

[46] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf. (last visited July 10, 2026).

[47] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps. (last visited July 10, 2026).

[48] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted). (last visited July 10, 2026).

economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

124. At all relevant times, each Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if either Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

125. As a result of the Data Breach, the Private Information of Plaintiff and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiff and Class Members, or likely to be suffered as a direct result of Defendants' Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendants with the mutual understanding that Defendants would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further injurious breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

**J. Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

126. In addition to a remedy for economic harm, Plaintiff and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

127. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.

128. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

129. As a result, Plaintiff and Class Members also request relief in the form of the future cost of credit and identity theft monitoring, which is reasonable and necessary. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach.

**K. Loss of the Benefit of the Bargain**

130. Furthermore, each Defendant's respective poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

131. When agreeing to directly or indirectly provide their Private Information to Defendants, Plaintiff and other reasonable consumers understood and expected that in exchange, each Defendant would properly safeguard and protect the Private Information, when in fact, Defendants did not provide the expected data security.

132. Plaintiff also reasonably expected that Defendant IRCO would adequately vet, monitor, and supervise all third-party vendors that shared Plaintiff's Private Information with, including Defendant Mercadien, to ensure Mercadien maintained proper security and safeguards sufficient to protect such sensitive Private Information.

133. Defendant Mercadien did not provide the expected data security. Furthermore, Defendant IRCO did not properly vet, monitor, or supervise third-party vendors, including Mercadien, to ensure they implemented adequate security measures. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**L. Plaintiff's Experience**

134. At all times relevant Plaintiff was s a customer of Defendant IRCO.

135. Plaintiff was required to provide his Private Information to Defendant IRCO as a condition of receiving its services, which Defendant IRCO then provided to Defendant Mercadien.

136. Defendants were in possession of Plaintiff's Private Information before, during, and after the Data Breach.

137. In entrusting his Private Information to Defendant IRCO, Plaintiff believed that, IRCO and any vendors it chose like Mercadien, would adequately safeguard that information. Had Plaintiff known that IRCO and its vendor Mercadien did not utilize reasonable data security measures, and that IRCO did not ensure that third-party vendors utilized reasonable data security measures, Plaintiff would not have entrusted his Private Information to IRCO.

138. Plaintiff greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about

identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

139. Plaintiff stores any and all documents containing his Private Information in a secure location.

140. As a consequence of and following the Data Breach, Plaintiff has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information.

141. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by Defendants' failure to timely notify him of the fact that his Private Information was acquired by criminals as a result of the Data Breach.

142. Defendants deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Data Breach in a timely manner.

143. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

144. Plaintiff has a continuing interest in ensuring that his Private Information, which upon information and belief remains in Defendants' possession, is protected and safeguarded from future breaches.

145. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not

adequately protect his Private Information; (d) emotional distress because identity thieves now possess his Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that his Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff; (g) misuse of his personal information as evidenced through access of his bank card and increased spam calls; and, (h) other economic and non-economic harm.

## CLASS ACTION ALLEGATIONS

146. Plaintiff brings this class action on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

147. The Classes that Plaintiff seeks to represent are defined as follows:

> Nationwide Class: All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach and received a Notice Letter (the "Nationwide Class").
>
> Pennsylvania Subclass: All citizens of Pennsylvania whose Private Information was compromised as a result of the Data Breach and who were sent notice of the Data Breach and received a Notice Letter.

148. Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

149. Plaintiff reserves the right to amend the definitions of the Class or Subclass or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

150. The proposed Classes satisfy the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

151. Numerosity. The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, at least hundreds of thousands of individuals were impacted. The Classes are apparently identifiable within Defendants' records.

152. Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Among the questions of law and fact common to the Classes that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendants had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. Whether Defendant IRCO breached implied contracts with Plaintiff and Class Members;

f. Whether Defendant Mercadien breached third-party beneficiary contracts with Plaintiff and Class Members;

g. Whether and when Defendants actually learned of the Data Breach;

h. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

i. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct; and,

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

153. Typicality. Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Classes.

154. Policies Generally Applicable to the Classes. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes

as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

155. Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

156. Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large companies, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

157. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the

costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

158. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

159. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

160. Unless a Class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

161. Further, Defendants have acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

162. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely notify the Plaintiff and the Classes of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard individuals' Private Information; and,

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class against Defendants)

163. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 162, as if fully set forth herein.

164. Each Defendant individually requires individuals, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing their services.

165. Defendants gathered and stored the Private Information of Plaintiff and Class Members as part of their ordinary course of business.

166. Specifically, Defendant IRCO collected and maintained Private Information in its capacity as a debt buyer and accounts receivable investment firm.

167. Defendant Mercadien collected and maintained Private Information through its provision of services to Defendant IRCO and its other clients.

168. Defendant IRCO directed the collection and transmission of customer Private Information to Defendant Mercadien and owed independent duties to oversee and supervise Defendant Mercadien.

169. Plaintiff and Class Members entrusted Defendants with their Private Information with the understanding that each Defendant independently would safeguard their information.

170. Each Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

171. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, each Defendants had an independent duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

172. Defendant Mercadien, as the entity entrusted with Plaintiff's and Class Members' Private Information, had a duty to implement cybersecurity controls and intrusion detection systems.

173. Defendant IRCO, as the debt buyer and accounts receivable investment firm who selected and directed use of the vendor Mercadien, had a duty to conduct due diligence and ongoing oversight of Mercadien's security practices.

174. Each Defendant had, and continues to have, a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

175. Each Defendant independently owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

176. Each Defendants' independent duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendants with their confidential Private Information, a necessary part of receiving services.

177. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

178. Each Defendant was subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or the Class.

179. Each Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information they were no longer required to retain pursuant to regulations.

180. Moreover, each Defendant had and continues to have a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

181. Each Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendants' possession might have been compromised,

how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

182. Each Defendant breached its respective duties, pursuant to the FTC Act and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information.

183. Defendant Mercadien breached its duties by failing to implement adequate security measures for Private Information entrusted to it by Defendant IRCO.

184. Defendant IRCO breached its duties by failing to adequately vet, monitor, and supervise its third-party vendor, Defendant Mercadien.

185. The specific negligent acts and omissions committed by each Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to Class Members' Private Information;

d. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

e. Failing to remove former Private Information it was no longer required to retain pursuant to regulations, and;

f. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

186. With respect to Defendant Mercadien specifically, its negligent acts and omissions include: (a) failing to implement adequate cybersecurity measures for Private Information entrusted to it; (b) failing to detect and prevent the ransomware intrusion; (c) failing to implement adequate network monitoring and intrusion detection systems; (d) failing to maintain adequate access controls for the systems containing Private Information; (e) failing to implement adequate encryption and data protection measures; and (f) failing to conduct regular risk assessments of its systems and networks.

187. With respect to Defendant IRCO specifically, its negligent acts and omissions include: (a) failing to conduct adequate due diligence before selecting Defendant Mercadien as vendor; (b) failing to require adequate contractual security obligations from Defendant Mercadien; (c) failing to conduct ongoing oversight and monitoring of Defendant Mercadien's security practices; (d) failing to audit or verify that Defendant Mercadien maintained adequate security controls; and (e) failing to terminate or take corrective action against vendors that did not maintain adequate security.

188. Each Defendant, through its respective actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within each Defendant's possession, custody, or control.

189. Each Defendant, through its respective actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' Private Information.

190. Each Defendant, through its respective actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the Private Information

within each Defendant's possession, custody, or control might have been compromised and precisely the type of information compromised.

191. Each Defendant's respective violations of Section 5 of the FTC Act constitutes negligence.

192. Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statute was intended to guard against.

193. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

194. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' respective inadequate security practices.

195. It was foreseeable that Defendants' respective failures to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting companies in possession of Private Information.

196. Defendants have full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

197. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of

providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendants systems.

198. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

199. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendants possession.

200. Each Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

201. Each Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

202. But for each Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

203. There is a close causal connection between Defendants' respective failures to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.

204. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' respective failures to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

205. But for each Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

206. There is a close causal connection between Defendants' respective failures to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.

207. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' respective failures to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

208. As a direct and proximate result of each Defendants' respective negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails and unauthorized access to Plaintiff's bank card; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

209. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

210. Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

211. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Nationwide Class against Defendants)**

212. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 162, if fully set forth herein.

213. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duties.

214. Each Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Private Information and not complying with industry standards.

215. Defendant Mercadien violated these standards by failing to implement adequate security for the sensitive data in its custody.

216. Defendant IRCO violated these standards by failing to oversee and supervise its third-party vendor Defendant Mercadien to ensure compliance with applicable security standards.

217. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants systems.

218. Defendants' respective violations of Section 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

219. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

220. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

221. As a direct and proximate result of Defendants' respective conduct, Plaintiff and Class Members have suffered or will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

222. Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

## COUNT III
## UNJUST ENRICHMENT

**(On Behalf of Plaintiff and the Nationwide Class against Defendants)**

223. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 163, as if fully set forth herein.

224. Plaintiff and Class Members conferred a monetary benefit on each Defendant. Specifically, they provided Defendants, either directly or indirectly, with their Private Information.

225. Defendant Mercadien received the benefit of Plaintiff's Private Information to provide services to Defendant IRCO.

226. Defendant IRCO received the benefit of Plaintiff's Private Information to provide its debt buying and accounts receivable services and conduct its business.

227. In exchange for the aforementioned benefits, Plaintiff and Class Members should have had their Private Information protected with adequate data security.

228. Each Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to them. Each Defendant independently profited from Plaintiff's data and used Plaintiff's and Class Members' Private Information for business purposes.

229. Defendant IRCO derived revenue from providing its financial services to Plaintiff and Class Members.

230. Defendant Mercadien derived business value from providing its accounting services to Defendant IRCO.

231. Defendants failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

232. Defendants acquired the Private Information through inequitable record retention as they failed to investigate and/or disclose the inadequate data security practices previously alleged.

233. If Plaintiff and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information at Defendants.

234. Plaintiff and Class Members have no adequate remedy at law.

235. Each Defendant respectively enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, each Defendant instead calculated to increase their own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants decision to prioritize their own profits over the requisite security and the safety of their Private Information.

236. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

237. As a direct and proximate result of Defendants' respective conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails and unauthorized access to her bank card; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed

up in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

238. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

239. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT IV**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class against Defendant Mercadien)**

240. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 162, as if fully set forth herein.

241. Plaintiff brings this count individually and on behalf of the Class against Defendant Mercadien.

242. Defendant Mercadien entered into contracts, written or implied, with its Clients, including Defendant IRCO, to perform services. Upon information and belief, these contracts are virtually identical between and among Defendant Mercadien and its Clients around the country whose customers, including Plaintiff and Class Members, were affected by the Data Breach.

243. In exchange, Defendant Mercadien agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

244. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered

into between Defendant Mercadien and its Clients, including IRCO. Defendant Mercadien knew that if it were to breach these contracts with its Clients, its Clients' customers—Plaintiff and Class Members—would be harmed.

245. Defendant Mercadien breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiff and Class Members thereof.

246. Plaintiff and the Class were harmed by Defendant Mercadien's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

247. Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

## COUNT V
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Nationwide Class against Defendant IRCO)

248. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 162, as if fully set forth herein.

249. Plaintiff brings this count individually and on behalf of the Class against Defendant IRCO.

250. Defendant IRCO offered to provide services to Plaintiff and the Class Members in exchange for their Private Information.

251. Defendant IRCO entrusted the Private Information of Plaintiff and the proposed Class Members to third-party vendors Defendant Mercadien.

252. Plaintiff and the Class Members accepted Defendant IRCO' offer by providing Private Information to Defendant IRCO, and in turn to third-party vendor Mercadien, in exchange for receiving IRCO' services.

253. In turn, and through internal policies described in the preceding paragraphs, and other conduct and representations, Defendant IRCO, agreed they would not disclose the Private Information they collect to unauthorized persons and that they would safeguard Plaintiff's and the Class's Private Information.

254. Implicit in the parties' agreement was that Defendant IRCO would provide Plaintiff and the Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Private Information.

255. Plaintiff and the Class Members would not have entrusted their Private Information to Defendant IRCO in the absence of such an agreement.

256. Defendant IRCO materially breached the contract(s) each had entered into with Plaintiff and the Class Members by failing to safeguard their Private Information, including the failure to supervise third-party vendor Mercadien to ensure Private Information was properly safeguarded, and by failing to notify Plaintiff and Class Members of the Data Breach. Defendant IRCO further breached the implied contracts with Plaintiff and the Class Members by:

a. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

b. Failing to ensure the confidentiality and integrity of electronic Private Information that Defendant IRCO created, received, maintained, and transmitted.

257. The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendant IRCO' material breaches of its agreement(s).

258. Plaintiff and the Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendant IRCO.

259. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

260. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

261. Defendant IRCO failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

262. In these and other ways, Defendant IRCO violated its duties of good faith and fair dealing.

263. Plaintiff and the Class Members have sustained injury-in-fact and damages because of Defendant IRCO's breaches of its agreements, including breaches thereof through violations of the covenant of good faith and fair dealing.

264. As a direct and proximate result of Defendant IRCO's breach of implied contract, Plaintiff and the proposed Class Members and are entitled to actual, compensatory, and consequential damages.

**COUNT VI**

**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Stat. §§ 201-1 to 201-9.2 ("UTPCPL")) (On Behalf of Plaintiff and the Pennsylvania Subclass)**

265. Plaintiff re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 162, as if fully set forth herein.

266. Plaintiff and Defendants are each a "person" as defined in 73 Pa. Stat. § 201-2(2).

267. Plaintiff and the Pennsylvania Subclass members purchased goods and services in "trade" and "commerce" as defined by 73 Pa. Stat. §§ 201-2(3).

268. Plaintiff and the Pennsylvania Subclass purchased goods and services primarily for personal, family, and/or household purposes under 73 Pa. Stat. § 201-9.2.

269. Defendants engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" as defined in 73 Pa. Stat. § 201-2(4) by engaging in the following conduct:

a) Representing that their goods and services had characteristics, uses, benefits, and qualities that they did not have—namely that their goods, services, and business practices were accompanied by adequate data security (73 Pa. Stat. § 201-2(4)(v));

b) Representing that their goods and services were of a particular standard or quality when they were of another quality (73 Pa. Stat. § 201-2(4)(vii));

c) Representing that their goods and services were of a particular standard or quality when they were of another quality (73 Pa. Stat. § 201-2(4)(ix)); and

d) "engaging in any other . . . deceptive conduct which creates a likelihood of confusion or misunderstanding" (73 Pa. Stat. § 201-2(4)(xxi)).

270. These unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 Pa. Stat. § 201-3.

271. Defendant's unfair or deceptive acts and practices include but are not limited to: failing to implement and maintain reasonable data security measures to protect client information; failing to identify foreseeable data security risks and remediate the identified risks; failing to comply with common law duties, industry standards including PCI DSS, and FTC guidance regarding data security; misrepresenting in their Privacy Policies that they would protect client data; and omitting and concealing the material fact that they did not have reasonable measures in place to safeguard client data.

272. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security practices and ability to protect PII.

273. Defendants intended to mislead consumers and induce them to rely on their misrepresentations and omissions. As set forth herein, Plaintiff did rely on Defendant's misrepresentations and omissions relating to their data privacy and security.

274. Plaintiff and Pennsylvania Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered with reasonable diligence.

275. Had Defendants disclosed to consumers that their data security systems were not secure and, thus, were vulnerable to attack, Plaintiff and Pennsylvania Subclass members would not have given their financial information to Defendant.

276. Defendants acted intentionally, knowingly, and maliciously in violating the Pennsylvania UTPCPL, and recklessly disregarded consumers' rights.

277. As a direct and proximate result of Defendant's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and the Pennsylvania Subclass have suffered and will continue to suffer damages, injury, ascertainable losses of money or property, and monetary and non-monetary damages as described above. 201. Plaintiff and Pennsylvania Subclass members seek all monetary and nonmonetary relief allowed by law, including the following as expressly permitted under 73 Pa. Stat. § 201-9.2:

a. "actual damages or [statutory damages of] one hundred dollars ($100), whichever is greater";

b. treble damages, defined as "three times the actual damages";

c. "reasonable attorney fees" and litigation costs; and d. "such additional relief as [the Court] deems necessary or proper."

278. Plaintiff and Pennsylvania Subclass members also seek the injunctive relief as set forth above and throughout this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself, and all Class Members, request judgment against Defendants and that the Court grants the following:

A. For an order certifying the Classes, as defined herein, and appointing Plaintiff and his Counsel to represent the Classes;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and

Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

   i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

   ii. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

   iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

   iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

   v. prohibiting Defendants from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

   vi. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on

Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants network is compromised, hackers cannot gain access to other portions of Defendants systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess their employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a S0C 2 Type 2 attestation on an annual basis to evaluate Defendants compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

xvii. Ordering Defendants to pay for lifetime credit monitoring services for Plaintiff and the Classes;

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees and costs as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff, individually and on behalf of the Classes, hereby demand a trial by jury on all claims so triable.

Dated: July 10, 2026

By: */s/ Kenneth J. Grunfeld*
Kenneth J. Grunfeld
**KOPELOWITZ OSTROW P.A.**
65 Overhill Road
Bala Cynwyd, PA 19004
Tel: (954) 525-4100
grunfeld@kolawyers.com

Jeff Ostrow*
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
ostrow@kolaywers.com

**Pro Hac Vice Forthcoming*

*Counsel for Plaintiff and the Proposed Classes*